Good morning, your honors, and may it please the court. My name is Mark Perry, and I represent Fiserv Trust Company in this case. Your honors, the plaintiffs in this case are investors who seek to hold Fiserv liable for losses they incurred in investments they choose to make. Their claim is that each of them was fraudulently induced to invest with an entity known as Heath. Their claim is that Heath committed a fraud, that Fiserv knew about it, and therefore that Fiserv should be held liable for it. The question on this appeal, which comes up by a Rule 23-F, is whether that claim can be certified as a class action. Your honor, in seeking to certify the class, plaintiffs relied almost exclusively on First Alliance, this court's decision in First Alliance. In certifying the class, the district court relied almost exclusively on First Alliance. Well, and it's pretty decent support. And let me explain first why they do that, and then let's talk about it. Thank you. First Alliance, since the modern class action rule was adopted in 1966, First Alliance is the only federal appellate decision ever approving class treatment. We're still stuck with it. We are not arguing with it before this panel, your honor. I get the threat. Let me explain why this case is different than First Alliance. First, let's look at the elements of a fraud claim. Fraud claim under California law requires misrepresentation and reliance. In First Alliance, there was no dispute that the sales agents followed a very carefully orchestrated and uniform sales pitch. There were videotaped training materials, written training materials. They had to memorize a 13-step pitch, and they delivered that with minor immaterial variations to each of the investors. It was essentially the equivalent of a written offering document that they read to each of the borrowers before they did it. And the court, in its opinion, repeatedly stressed the uniform nature of the sales pitch. Let me ask you something on that, Mr. Perry, if I may. Here, for sure, there was not such a thing as the track spiel. And evidently, Heath's people said different things to different potential investors, invest in subs or invest in trains or whatever. But here's my question. Why do those differences matter when you have got an orchestrated common scheme whose gravamen is we're going to invest your money such that you get a rate of return on it from your investment instead of the truth, which was from the contributions of other investors? So why doesn't that common generic scheme predominate and therefore render almost immaterial the differences in discrete details? Your Honor, to prove that theory, and I appreciate the question because it goes to the heart of the case, I think, they have assumed that there is a fraudulent scheme. If you look at their brief on page 40, they say that they have adequately alleged the principal fraud in paragraphs 1, 2, 4 through 8, and 23 of their complaint. If you look at those paragraphs, they say that Heath promised a rate of return and that the investments would be secured, period. Your Honor, if this were a motion to dismiss, that is not an adequate complaint under Rule 8. That's certainly not an adequate complaint. But the problem is we're not here either on a motion to dismiss or on a summary judgment having to do with the merits of the. But what the court would have to decide. You've got to coordinate them, and I understand that. This is the issue, Your Honor. This is not a 23A problem. We're not saying that there are no common questions. This is a 23B3 predominance issue. How would the court actually try this case? What must the plaintiffs prove? That at the time Mrs. Tate made her investment, the salesman at that time had no intention of investing her funds, as he said he would, and that she wasn't going to get that investment. These funds were all invested in the things that these plaintiffs were told they were invested in. Their allegation is that at some point, some undefined point, there is no date in the complaint, that the returns on those actual investments became insufficient. And these heath people, at some point, no date in the complaint, started to use later investor money to pay earlier investors. That could be proved or evidence taken on when the turning point came. Isn't that right? And are there any members of the class that were before the turning point? We don't know when the turning point is, Your Honor, if it ever happened. There's no allegation in the complaint. There's no evidence in the record. The plaintiff seeks a hold. The class is defined as everybody who ever invested with Heath and lost money. We are entitled to hold them to their burden of proving that Heath committed the primary violation. Remember, in First Alliance, there was well-established evidence that before Lehman ever got involved, First Alliance had developed this scheme, and it was a scheme throughout Lehman's involvement. Here, there is no evidence, there's not even an allegation, as to when the Heath investment vehicle became so-called fraudulent. The plaintiffs want to simply ignore when the fraud occurred. But can we assume that the persons who lost money came after the tipping point? No, Your Honor, because these were long-term investments. They were told that at the time. And whether they lost money after the tipping point, if when they invested, the representations made to them were not fraudulent, nobody's liable as a primary actor, and certainly my client's not liable as a secondary actor for investments that were made at a time on the basis of truthful representations that later turned out to be bad because the scheme fell apart. Remember, we are entitled to put to the proof what was told when, who was told what when, and then, importantly, what they relied on. Because reliance, which was not at issue in the same way as it is here in First Alliance, is very much at issue here. These investors were allegedly told a series of different things. Why isn't this sort of similar to Vasquez, which I realize is a California state case? But the predominant common misrepresentation was that the freezers, I don't remember exactly, had high quality and were guaranteed for life, something like that. And the court more or less said, well, sure, there were different brands bought and there were different models bought. But the heart of this thing was a predominant common misrepresentation. So by analogy, why isn't the predominant common misrepresentation here that you would have a rate of return coming off of your investment and not off the contributions of other people? Because, Your Honor, in Vasquez, the scheme itself was adequately alleged and then proved. That is, the freezer salesman set out at the outset to misprice the sort of package of the food plus the- Well, Mr. Ray, you keep coming back to it, and I understand why you do, but to the fact that it hasn't really been played quite right and it's not going to hold up quite right, sort of merits-based arguments. So how do you mish the two? I would point the court first to the Second Circus decision in the IPO case, where it explains very clearly why, even if it's a merits-based argument, you have to consider it on Rule 23 if it goes through Rule 23 issues. And I would point the court to the defect in this pleading is intentional. The plaintiffs have not pleaded who said what to whom, when they said it, where they said it, what was said, and why it was intentional. Sure, because that's not their theory. I mean, their theory is that doesn't matter. Well, their theory, Your Honor, is- I mean, their theory is that everybody in this pot got told the same thing. That is, whatever you invest in, whether you invest in, you know, we put your money into General Motors or we put it into Chrysler, it's the return you're going to get coming from that investment, whereas the truth is it wasn't. And, Your Honor, in 1991 or in 1995, they would have to show that that was true at that time to the investors who were told things on that date. And we would be entitled to show for those investors on that date, when the investment was made in 1995, that Heath fully intended to invest the money in Quiznos subs, did invest the money in Quiznos subs, and had no intention of using later investor money. The scheme has to have a start date. There's no allegation as to when it is. There's no evidence as to when it is. And so to figure out when it is, we would have to examine each individual investor, and Heath as to the individual investors, to determine when it is, if ever, that the investment scheme crossed the line. And does the certification in its present form preclude you from making those arguments with respect to the sufficiency of the pleadings or proof? Your Honor, we will make those arguments and they will overwhelm any common issues. They will become, it will become a series of individual cases that we will have to make precisely those determinations. And again, that's why I stress that this is a predominance case, not a commonality case. There are common questions, but to answer them will require this. I'm told, for example, it's not in this record, that the criminal trial that's going on has been going for more than three months and it only involves a relative handful of investors. These things are very, very fact-intensive to do the discovery and try this case. It's not enough to say, did Heath do a bad thing? It's, when did he do it? Which investors were affected? Which investors were told the wrong thing went? And again, I would point to the court, it is telling that this complaint is so deficient on any concrete allegations about the principal fraud that they're seeking to hold my client liable for aiding and abetting, which brings us to the next distinction with First Alliance. First Alliance was an aiding and abetting case. The court stressed two things. There are two requirements under California law for aiding and abetting, knowledge and substantial assistance. On knowledge, the First Alliance court stressed that Lehman undertook an investigation, found out that First Alliance's activities were fishy, and continued to lend, in fact, ramped up its lending. Here, the first investigation that my client, Fiserv, ever took was in 2003. And within 60 days of starting it, Fiserv canceled all future investments in Heath products. So that, as for the knowledge prong, the only things they can point to that we did are the opposite of First Alliance. Second, on substantial assistance, First Alliance made it clear that without Lehman's participation as the funding source, First Alliance couldn't have continued making these mortgages. There can be no such claim here. Fiserv was simply the custodian for the assets held by fewer than half of the class members and less than half of the money invested with Heath. Heath successfully did whatever he was doing. And again, we don't know what Heath was doing. We're the custodian. We don't have access to Heath. For more than half of the class members, more than half of the money, had nothing to do with Fiserv. There can be no credible notion that if we had not been involved here, Heath wouldn't have been doing what he was doing. We were simply holding these assets. The most that can be claimed, and on page nine of their brief, Your Honor, they point to all the evidence that they think shows that Fiserv knew what Heath was doing. The most that can be claimed is that we knew, or should have known, that Heath's investment products were not registered. Not qualified is the term used in the California law. Of course, unregistered securities can be sold all the time under any number of exemptions. Their claim really has to be that we knew they weren't registered and that they weren't accepted. But why wouldn't your knowledge, whatever it was and whenever it was obtained, be true across the board of every investor? Your Honor, when it was obtained and what it was, I think that is a common question. We're not denying that there are common questions in the case. But, again, it's a very different case than First Alliance, where, again, Lehman started lending to First Alliance in 1995, but the damages period doesn't start until 1998 when they actually did their investigation. Here, we did our investigation in 2003, but they want to go back not only to 1995 when the first investment was made through Fiserv, but to 1991 when the first investment was made with Heath before Fiserv had ever heard of Heath, had ever heard of any of these class members. You know, it is striking in this case, Your Honor, that more than half of the class never had any contact with my client. They never had accounts there. They never had contracts there. They never... Is that a liability question, I mean, that you can get rid of? You know... I don't understand, in a way, how this came down as it did because a lot of the arguments you made make enormous sense. I mean, I don't get how that could be the case, but that's not an issue on class certification directly. Your Honor, it is... It's sort of tied up with it, but why can't you just go move to dismiss on that basis? We did, Your Honor, and she denied it, and we think that's wrong, and that's not an appealable order, so... Okay, so, or summary judgment. But on this appeal, again, I stress, the court has to consider how this case would actually be tried. And if we can't secure a liability determination on that issue, what is it we are defending against as the trust company for these 850, 900 people who we don't know who they are, who have no contract with them? You're not going to be precluded from putting all this into evidence and winning. No, Your Honor, and if we have to keep going, we will put it all into evidence and we will win, but it will be a gargantuan trial of, you know, a morass of individualized issues. I mean, the nature of this case is that in one-on-one meetings, some third party lied to individual investors and got them to commit money. For us to defend against that, we have to show either that they weren't lied to or that if they were lied to, we didn't know about the lies. For each of those things, it's going to require some tremendously individuated circumstances. I mean, this is precisely the case that the advisory committee described, that when they said some fraud cases may be suitable for class action. Now, they started that out by saying, you know, at the time in 1966, people thought no fraud case was suitable for class action. So, they said some fraud cases may be, but not where the misrepresentations varied or the degrees and types of reliance varied. Both of those are present here. Add on the aiding and abetting problem, which just adds a whole other level of complexity. This is just not a class action. This may be an individual action. It may be a criminal case. It is not a proper class action under Rule 23. I'd like to reserve that. And I just have one quick question. I noticed in your reply brief, you say that one of the concerns with certification of the class is that the class period predates the defendant's relationship with the alleged principal. So, apparently, 1991 is when this all began. First Trust became involved in 1995. Correct. So, at the very least, you're suggesting that, at least it's your argument, that the class should be limited to conduct taking place after 1995. Your Honor, we would submit the class to be limited, if there's a class at all, to conduct taking place after Heath started doing something wrong and that they have to prove what that date is. It's not the first date. But, in any event, after 1995. Certainly after 1995. So, you start with that. So, you think the class is too broad because it goes all the way back to 1991 when you weren't even involved at all. Correct, Your Honor. They're essentially trying to make FISERV an insurer for all of their investments regardless of any conduct. You say, okay, we shouldn't be involved prior to 1995 because we weren't involved. So, the class shouldn't go that far. Then you say, and it shouldn't go back to 1995 because we didn't even learn about it until 2003. Correct. And so on. And what we learned about, we didn't know that he was doing fraudulent. We still don't know if he was doing anything fraudulent. That relationship doesn't exist. And when you say, in your plied belief, the class is too broad because it includes members who were not defrauded but rather lost money on legitimate investments. That's a tough one to break down, right? Well, Your Honor, we'd have to show for each investment that at the time it was made, remember this is an inducement case, that at the time it was made, the salesman lied to the individual investor. If at the time the salesman said, we're gonna invest your money in Quiznos, they took the money invested in Quiznos, we can't be held liable. We, as a third party, non-party to the transaction, that's just an asset that we're holding in an account. I mean, we're getting paid $40 a year to do record keeping and be trying to bring up this fraud. We have to prove it. We don't know what the facts are. They haven't even alleged what the facts are. Well, I'm not sure that the class action prevents you from proving all of that and not going to individuals one by one if you can just show you did not have knowledge. We will do that, Judge Fletcher, but the class action rule does require both predominance and superiority, and we think in a case like this, those factors break down because it becomes individualized, that it should proceed, if at all, in individual cases. Thank you. Thank you, Mr. Perry. May it please the Court, Kevin Ruff on behalf of Appelli Plaintiffs. Your Honors, I think I'll be referring to the defendant as first trust because that's the terminology that we, on our side, have been using. Throughout the whole brief, one of you have been referring to it as one thing, the other says the other. Right. I would try to say five-serve, but I think I might make some mistakes. It's the same, though, right? No question. The same, the same. I begin by saying that First Alliance is binding Ninth Circuit precedent on the issue before the Court, and the issue before the Court is very much, I think, as Judge Reimer has indicated, the degree to which the central scheme is really in question. The other side said some interesting things, the first of which is that we need to ask how this case will actually be tried. How will it? Well, I think First Alliance is actually an excellent... I mean, if this order stands as it is, how do you present your case, and what's it possible to use in defense? I think all the questions hit on exactly our position regarding this case, which is that they are not precluded from bringing any defense, and a very interesting fact about First Alliance, which we've been all talking about, is that First Alliance came to this Court after trial, and we've been talking about the degree to which reliance could be shown on a class-wide basis. An interesting fact is when it got here after the trial, the class-wide proof of reliance was not an issue, thus suggesting that Fulbright and Jaworski, an excellent law firm, which would presumably have brought all issues, realized it wasn't an issue, because upon trying the case involving a massive fraud, they realized that they didn't really have an... To an extent, what you're doing is, by posing that as the issue, you're answering the question. I mean, it's very simple to do if you suppose that the fraud is a single misrepresentation that is communicated to every possible, or every putative member of the class. Then it's easy. Then you can, presumably, assume reliance if one person, reasonable person, would have relied, right? Well, yes, Your Honor, but... So here, you've got a slightly different situation. I mean, your argument has to depend entirely on the fact that this is, and always was, a Ponzi scheme. And no matter how it was dressed up, at its core, it was a single misrepresentation communicated to every investor, upon which it would have been reasonable to rely. Yes? Well, that is our, that's what our complaint says, but Your Honor, I'd like to, I think there are variations on that. And I don't think any of them prevent, or even in any way stand in the way of class certification. I think you got it right when you asked, well, don't these things go to proof? There is one single proof. There's one answer to the question, when did First Trust learn about this Ponzi scheme? There is one answer. And that answer will apply to every single person who is a plaintiff in this case. They've said, and I think it's wrong. I don't think that's your problem. I mean, I don't think that their knowledge is gonna be their knowledge whenever they got it, I mean, presumably. But the aiding and abetting theory, and including particularly breaches of fiduciary duty and breaches of administrative responsibilities, are awfully individual. Well, well, they're not. They're indiscreet. Well, if. I mean, they didn't, they didn't, they didn't screen a particular signature carefully. Well, Your Honor, Your Honor, those examples, we obviously have a big difference of opinion as to what the examples in the complaint show. Well, the examples come right out of your footnote in your brief, and as indicating why all of these issues are common and predominate. Now, maybe commingling does, but I have a hard time seeing how, you know, goofing up on a, clearing a signature does. Well, Your Honor, we used examples because we're proving a negative. You know, if you had to show that somebody didn't read a book, you would show that by, perhaps, an example where the person didn't know what happened in chapter nine. We're saying that these guys never took control, never understood, never cared at all about what these Heath investments were, and we've given some specific, we're not, just not our word, but here's some evidence of examples that clearly show, by circumstantial evidence, that this is true. Well, let me ask you this. In a case management sense, as this case goes on, I'm not quite sure how this has all come down. I mean, we don't have the benefit of the entire district court proceedings, or at least I haven't read them. So, you've got a class certification order that's broad. Is there, in the course of the case management, do you anticipate that its breadth would be winnowed down or refined? Well, Your Honor, we are, as you know, we're against excellent lawyers, and we have been talking about a summary judgment that's coming down the pike, and I'm sure that will come down certainly before the case is tried. Well, because, I mean, you know, I can easily see how you have got a common issue that predominates, or two, or maybe three, but there's a lot of wrinkles. And so, you know, should we refine them? Do we have any basis to refine them? Or do you anticipate that the district court on a proper motion from Gibson will refine them, or what? Well, Your Honor, you know, I'd like to explain why the class is open-ended, and the reason, of course, is, you know, I haven't talked about it, and it's not necessarily before the court, but these are, this is 1,700 people whose average age is 75. Well, I understand, but that doesn't necessarily mean that it has to be open-ended. Well, we as fiduciaries for them don't know exactly when FISER, First Trust, became aware of the fraud, and therefore it is true. We can't in our complaint say exactly when it happened, but, you know, Mr. Perry has asked you to just take his word for the fact that they didn't hear about it until 2003. We've got a lot of evidence about it. Well, no, I mean, I wouldn't take, I mean, I'm not saying I wouldn't take his word. That's not the point. It's not in, his word isn't in the record. Right, and. But there must be some mechanism to narrow this thing down. I mean, that's the whole, I guess, my problem. Well, I think like in a securities case, Your Honor, what will happen is, based upon the evidence and based upon the findings of fact, a date will be established for when this became a Ponzi scheme. That's a central fact, and that would sure be a shame in terms of a waste of judicial resources to have to have 1,700 trials to figure out when a Ponzi scheme started. Well, I guess it has to be when the Ponzi scheme started and when they had knowledge. Correct, that's our position. But it couldn't have been before 1995, could it? No, it couldn't have been. So that's too, we know the class is too broad right now. We know it's too broad. However, it's fairly close because we, the class as defined includes all people who lost money. Right. And we don't believe that there were, there were almost no investors before 1995, but yeah, there is no question that there are some investors who are improperly part of the class. But that would be one reasonable limitation. Certainly, and I did want to address another point because counsel has been talking about our need to show that at the sales point, a lie was made. And we don't believe that's true. This, again, the scheme we're alleging is a situation where it is possible in 1995 that Dan Heath, if you weren't running a Ponzi scheme at that moment, said, I'm going to invest in something and actually did. But subsequent to that, every one of these investors got monthly, quarterly statements telling them, this is what your investment's worth. It's tracking along, you're fine, don't worry about it. Everything's well, it's appreciating as expected. And if at some point in that train, it's become a Ponzi scheme, then that person is now being defrauded. Every month, every quarter, they're being defrauded. They're being told a lie that's keeping them in the investment. I don't think anyone would say, and one of our concerns here, or certainly a fact about this case, is that this case and they in all, very fairly, I think in their brief, make it clear that their standing with regard to the fraud is the same standing as Dan Heath. And it certainly would be a shame, and we can't imagine it could be true, to say that Dan Heath could not be sued on a class-wide basis by the 1,700 people who lost their life savings in a Ponzi scheme. Would you come back to the breach of fiduciary duty and the administrative defaults issue? It seems to me that that is quite problematic. Well, Your Honor. There wasn't much discussion on the district court's part, and that is not a First Alliance problem. Well, there's a case, I believe, Clay v. Humana. One of the interesting things in that case, and they've used that as, I guess, their central point regarding the breaches of contract and fiduciary duty, one of the things that's distinct about that in our case is that that case involved multiple defendants and multiple contracts. Our situation involves the same contracts. And in fact, one of the issues I believe that the district court pointed out is the meaning and the legal significance of the exculpatory provisions in those contracts, again, as applied to all of the members of the subclass who were contractually related to First Trust. I mean, we think that, again, if you look at the broad issues, and again, according to Blackie v. Barak and this whole line of cases in the Ninth Circuit, if the trial court... Well, it's not a securities fraud action. I mean, I... Well, I was gonna refer to the portion of that case that talks about the trial court's need to predict how issues will play out. And if one predicts how issues will play out, actually, another point that Mr. Perry made that I wanted to comment on, he said, the criminal case has been going along and it only involves a handful of investors. That's true. That case is not limited to the losses and damages of that handful of investors. That case is about the whole $145 million pie. And they're trying that case using exemplars. And... Yeah, see, I don't have much trouble with that. But you've gone, you're one step away from it and you're several steps away in terms of your legal theory. In what sense, Your Honor? Well, I mean, first, first, first serve, whatever it is. Hi, sir. Hi, sir. Doesn't, I mean, it may stand in Heath's shoes in one respect, but you're saying that, you know, it itself breached some fiduciary duties. Well, and I'll talk about those. The fiduciary duties, we claim they breached. The primary one, and you pointed to it, is the commingling. That every single time they made a purchase for any of the 14 different named products that Heath was offering, they sent the check to the exact same entity. And that's also something that the individuals could not have known. Because in that context, FISR, First Trust, is the hub of the wheel. There are all of these events happening. They're the only ones who know that every time we buy something, regardless of what it is, Heath's telling us to just give it to the same account. That's a fact that is across the entire class. The other facts across the entire class include how Heath reported values. Other facts include how Heath dealt with dividend reinvestments. Other huge fact is that we allege that Heath never, I'm sorry, First Trust never actually reviewed the investments at all, as I brought up earlier. They never reviewed the investments at all. Did not have a clue what it was they were supposed to hold, or what it even was. They're calling these limited partnerships at times, and they're taking dividend reinvestments on limited partnerships, which just doesn't make any sense at all. It's incomprehensible how you could have a dividend reinvestment on a limited partnership. Okay. Are there any other questions? If not, I'll submit. Well, you were asked quite a while ago, how is this gonna be tried? And it kind of got off. Can you answer that very briefly? How is this gonna be tried? 1,700 people, they're not gonna have them all sitting in the courtroom. It seems unlikely that the trial will involve blaming the victims. It seems what will happen is that there will be testimony regarding when this became a Ponzi scheme, and that will require probably some forensic accounting. And then there will be a lot of testimony about what the contracts say. FISERV always, never neglects to talk about the fact that they're supposed to be a custodial trustee without responsibility for someone's investment. There will be potentially expert witnesses on that subject. And then, of course, there will be witnesses regarding the communications that occurred between First Trust and FISERV, and presumably a few witnesses to talk about their actual losses. Again, going to Blackie versus Brock, there was a conversation, or there's a discussion of the rebuttable presumption, and in that case, they said, yes, the defendant doesn't lose any of his rights, or its rights, but the trial court can make some limitations on how the evidence is presented. I would think it would be similar in terms of the victims to how it's being presented in the criminal court. I'll submit. Thank you, Your Honor. OK, thank you. Mr. Roth, Mr. Perry. Judge Reimer, the way to cut this thing down, if you will, is to require the plaintiffs to plead an adequate case. He said he can't believe you couldn't bring a class action against Dan Heath. You could not bring it on this complaint. This complaint does not meet the standards set up by Bell Atlantic versus Twombly, which says you can't just say there's a Ponzi scheme, proof to come later. You have to prove specific allegations of what, when, where, and why, under Rule 9b in a fraud case. They haven't done it. He just admitted to you, he doesn't know when it became a Ponzi scheme. If they don't know now, the way to find out is to bring an individual action and try the case, and the principles of res judicata and collateral estoppel can apply to other members who may have an interest. But we can't just jump straight into a class action based on a complaint that is, on its face, deficient to plead the fraud for which they're trying to hold my client secondarily liable. So the problem here is not in the certification. I mean, the certification is a problem, but the certification was premised on the district court's acceptance of the complaint in the first place. This complaint is not a valid complaint. It does not plead an actionable fraud. You tried to get a dismissal, didn't you? Yes, Your Honor. So you've lost on round one on that. And if you look at the court's order, the court simply says it adequately alleges a fraud. And if you look at the complaint, and look at the paragraphs they look at, paragraphs 1 and 2, 4 through 8, and 23, that's what they claim is sufficient to allege a fraud in federal court. If those paragraphs are sufficient to plead a fraud in federal court, Your Honor, then Bell Atlantic doesn't mean what it says. The court, and that gets to the certification problem. So, Judge Reimer, I'm just trying to answer. The problem here is not that we're arguing the merits. It's that the certification order is wrong because the merits are wrong. Practical question, because I've never had any part of it. How does the notion of decertifying work?  Yes, down the road. I mean, in discovery, we would bring forward more facts. And we could come and make a motion to decertify on the basis that individual, and you make these same arguments. That is available to the court. On the other hand, Rule 23-F was put in to let us bring it up to this court. I understand. I just wanted to know how it worked. Well, Your Honor, the way it would work in this case, we would submit, is the right answer is to vacate this certification order. If these four individual plaintiffs want to proceed through discovery or whatever, and then they think they can come up with a trial plan and move for recertification, that would be appropriate. But where we are now is with this certification. You understood me to say re. I said de. I understand that. Yeah, OK. But decertification would only happen if you were to affirm this. No, I understand. But I just wanted to know how it would play out, because I've never had one. We would think, if the court were to affirm, and of course, we urge you not to do that, we will go back and do more discovery. We do have a summary judgment coming up. The contours of the case may change. And the rule does authorize that. But again, the rule also authorizes us to come up here now and ask for a straight vacator. Anything else? Thank you, Your Honor. Thank you, Mr. Perry. Thank you, counsel, for your argument. The matter just argued will be submitted, and the court will be.
judges: Fletcher, Rymer, Beistline